UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CARL WILSON,

        Plaintiff,

    v.                               **Case No. 2:18-cv-515**
                                        **Magistrate Judge Chelsey M. Vascura**

ACTING SECRETARY ROBERT
WILKIE, *et al.*,

        Defendants.


**OPINION AND ORDER**

      Plaintiff, Carl Wilson, brings this action against Defendants, the U.S. Department of Veterans Affairs and its Acting Secretary Robert Wilkie, asserting claims of gender and disability discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act"), respectively, as well as a claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), *et seq.* ("EPA"). This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c), is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 31.) For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED**.

                **I.**        **BACKGROUND**

      In April 2005, the Department of Veterans Affairs hired Carl Wilson ("Plaintiff"), an African American male with disabilities including degenerative disc disease, a knee condition (requiring bilateral total knee replacement), anxiety and depression, at the Chillicothe Veterans

Administration Medical Center ("VAMC"). (Pl.'s Mem. In Opp'n, ECF No. 34.) Initially, Plaintiff worked as a food service worker, and then as a medical support assistant in the dental department, and finally began working as a Recreation Assistant in late 2009. (*Id.*) Plaintiff continued working as a Recreation Assistant until the VAMC terminated Plaintiff's employment on April 26, 2017, after he tested positive for marijuana. (Decision of the Merit Systems Protection Board ("MSPB Decision") at 2, ECF No. 31-13.)

The undisputed facts underlying Plaintiff's termination are as follows: On March 10, 2017, the VAMC dispatched a police officer to veteran patient Barry Maxwell after he was found with marijuana on his person for the third time in four months. (MSPB Decision at 2, ECF No. 31-13.) VA Police interviewed Mr. Maxwell, inquiring as to where he had obtained the drugs. *Id.* Mr. Maxwell disclosed that he had acquired the marijuana from a man named "Butch," referenced as "A.T." in this case. (Pl.'s Mem. in Opp'n 6, ECF No. 34.) Mr. Maxwell also advised VA police that he bought drugs from Plaintiff the previous summer, specifically pills and heroin. (*Id.* at 7.) In addition to A.T. and Plaintiff, Mr. Maxwell named two others who he alleged dealt and delivered drugs on VAMC grounds, Gary Simmons and J.P. (*Id.*) A.T., J.P., and Mr. Simmons are Caucasian men; Mr. Simmons is a VAMC employee and both A.T. and J.P. are VAMC patients who participated in a Compensated Work Therapy Program ("CWT"). (Defs.' Mot. 6–7, ECF No. 31.)

The VAMC implemented a Drug-Free Workplace Program in response to legislation on federal employee drug testing. (Defs.' Mot. 4, ECF No. 31.) This program divides the VAMC's employees into either a "testing designated position" ("TDP") where the employee is subject to random monthly drug tests, or a "non-testing designated position" ("non-TDP"). (MSPB Decision at 3, ECF No. 31-13.) Plaintiff's position, Recreation Assistant, was a non-testing

designated position.  *Id.*  As a "non-TDP" employee, Plaintiff was subject only to "reasonable suspicion testing" indicative of on-duty use or impairment, as outlined in Chillicothe VAMC Policy Memorandum 05-07, Drug-Free Workplace Program.  *Id.*  If an employee subject to this policy tests positive for drugs, the VAMC may choose from a variety of disciplinary actions, including "removal."  (*See* Defs.' Reply 5, ECF No. 35 (citing VA Handbook 5838 Section 8(c)).)  The VAMC contends that it typically removes employees who test positive, without regard to race or disability status.  (Defs.' Mot. 13, ECF No. 31.)

In response to Mr. Maxwell's disclosure to VA police, Plaintiff's supervisor ordered both Plaintiff and the other VAMC employee, Mr. Simmons, to submit to a drug test.  (MSPB Decision at 2, ECF No. 31-13.)  (*See also* Defs.' Mot. 7, ECF No. 31.)  The supervisor did so at the recommendation of the VAMC's Employee Labor Relations Specialist.  *Id.*  Plaintiff's drug test came back positive for marijuana metabolite (THCA); Mr. Simmons tested negative.  (Defs.' Mot. 8, ECF No. 31.)  Pursuant to the VAMC's policy, it ended Plaintiff's employment.  (*Id.*)  The two patients named by Mr. Maxwell who worked as part of the CWT program were not subject to the same Drug-Free Workplace policies.  (*Id.*)  Instead, the VAMC notified A.T. he could no longer participate in the CWT program "because he [was] being investigated for alleged illicit activity."  (*Id.*)

On June 16, 2017, Plaintiff appealed the VAMC's decision to remove him to the Merit Systems Protection Board ("MSPB").  (MSPB Decision at 1, ECF No. 31-13.)  Plaintiff argued before the MSPB that the VAMC lacked reasonable suspicion to order his drug test, and that his termination constituted race and disability discrimination in violation of Title VII and the Rehabilitation Act.  The MSPB reversed the agency's decision to remove Plaintiff from employment.  *Id.*  It found that "based on the totality of the circumstances," the VAMC failed to

establish reasonable suspicion to order Plaintiff to take the drug test; therefore, it could not sustain Plaintiff's removal based on the positive test result. *Id.* at 12. The MSPB rejected Plaintiff's claims of race and disability discrimination, stating Plaintiff failed to show "he was treated differently than any similarly situated employee outside his protected class" or to provide any evidence that race or disability played a part in the decision. *Id.* at 15–17. The MSPB ordered the VAMC to cancel the removal, to retroactively restore Plaintiff effective May 26, 2017, and to pay him appropriate back pay. *Id.* at 20–21. The VAMC had not tried to fill Plaintiff's position. (Defs.' Mot. 11, n. 5, ECF No. 31.) After MSPB ordered the VAMC to reinstate Plaintiff and he later retired, the VAMC eliminated his position. (*Id.*)

Plaintiff appeals the MSPB's rejection of his Title VII race discrimination claim and his Rehabilitation Act disability discrimination claims pursuant to 5 U.S.C. § 7703. Plaintiff also advances a claim in this civil action that was not before the MSPB: that he performed the same work as, but was paid less than, two female recreation assistants employed by the VAMC in violation of the EPA. Plaintiff seeks compensatory damages in the amount of $300,000, punitive damages in the amount of $300,000, attorney's fees, court costs, interest, and all other relief determined to be appropriate and just. (Compl. ¶ 12–17, ECF No. 1.)

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.*

4

Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255 (citation omitted).  "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record").  "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III. DISCUSSION

Plaintiff asserts discrimination claims under Title VII and the Rehabilitation Act, as well as a claim for violation of the EPA.  The Court will consider each claim in turn.

### A. Discrimination Claims

Plaintiff alleges his termination was a result of his race (African American) in violation of Title VII of the Civil Rights Act and his status as a disabled person in violation of the Rehabilitation Act.  (Compl. ¶ 12–17, ECF No. 1.)  In their Motion for Summary Judgment, Defendants argue they are entitled to judgment as a matter of law because Plaintiff cannot show any similarly situated, non-protected employees were treated more favorably.

5

Plaintiff does not allege direct evidence of discrimination, instead relying on circumstantial evidence. Where a plaintiff relies on circumstantial evidence of employment discrimination under either Title VII or the Rehabilitation Act, courts analyze the claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and refined in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *E.g.*, *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (applying *McDonnell Douglas* framework to a Title VII claim); *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (applying the *McDonnell Douglas* framework to a Rehabilitation Act claim). The plaintiff has the initial burden of proving his or her *prima facie* case by a preponderance of the evidence. *Id.* If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer "to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." *Jones*, 488 F.3d at 404 (citing *Burdine*, 450 U.S. at 253). If the defendant-employer satisfies its burden, the plaintiff must then show that the reasons offered by the defendant were pretext, and the real reason was unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Battle v. Ohio Dep't of Rehab. & Corr.*, No. 2:09-CV-651, 2010 WL 3365938 at *9 (S.D. Ohio Aug. 20, 2010) (citing *Burdine*, 450 U.S. at 253).

Plaintiff can defeat summary judgment only if his evidence is sufficient to create a "genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Jones*, 488 F.3d at 404. Here, Plaintiff fails to carry his burden in establishing the first prong of *McDonnell Douglas*. His inability to establish a *prima facie* case for either race or disability discrimination ends the analysis.

6

1. **Plaintiff has failed to make a *prima facie* case of race discrimination under Title VII.**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). In order to establish a *prima facie* case of race discrimination by the defendant, the plaintiff must show:

> (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class . . . [t]he fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably.

*Clayton*, 281 F.3d at 610 (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

It is undisputed that Plaintiff meets the first three elements of his *prima facie* case. Plaintiff is an African American male, he was qualified and served as a recreation assistant for almost seven years, and he was fired from this position. The VAMC did not try to fill Plaintiff's position and it eliminated his position after MSPB ordered the VAMC to reinstate Plaintiff and he later retired. (Defs.' Mot. 11, n. 5, ECF No. 31.) Therefore, in order to establish a *prima facie* case of discrimination, Plaintiff must show that he was treated differently than similarly situated employees from outside the class.

When addressing the fourth element of the *prima facie* case, "[i]t is fundamental that . . . the plaintiff must show that the 'comparables' are similarly situated *in all respects*." *Clayton*, 281 F.3d at 610–11 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original)). The United States Court of Appeals for the Sixth Circuit has noted three

factors relevant to determining whether employees are "similarly situated" in the context of cases alleging differential disciplinary action:

> [T]o be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have (1) dealt with the same supervisor, (2) have been subject to the same standards and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Mitchell*, 964 F.2d 577 at 583). The Sixth Circuit has further clarified that the *Mitchell* factors do not require a plaintiff to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Clayton*, 281 F.3d at 611 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original)). Finally, the Sixth Circuit "has asserted that in applying the standard [that plaintiff must show that he is treated differently than similarly situated employees from outside the class] courts should not demand exact correlation, but should instead seek relevant similarity." *Id.* (quoting *Perry v. McGinnis*, 209 F.3d 482, 601 (6th Cir. 2000)).

Applying the principles set forth in *Mitchell*, *Ercegovich*, and *Perry*, the white VAMC workers, J.P and A.T., to whom Plaintiff seeks to compare himself were not similarly situated "in all respects," nor were they similarly situated in the "relevant aspects." Plaintiff argues that he was subject to less favorable treatment than J.P and A.T., who were also named by Mr. Maxwell but were not subjected to a mandatory drug test. (Pl.'s Mem. in Opp'n 7, ECF No. 34.) However, Plaintiff is a federal employee of the VAMC, subject to the policies of the VAMC's Drug-Free Workplace Program, whereas J.P. and A.T. were patients in the VAMC's CWT

program and were not federal employees subject to the Federal Drug-Free Workplace Program. (Defs.' Mot. 8, ECF No. 31.) The statute governing the CWT program states that patients whose services are used for therapeutic and rehabilitative purposes, as J.P. and A.T.'s were, "shall not under these circumstances be held or considered as employees of the United States for any purpose." 38 U.S.C. § 1718(a). Therefore, turning to the *Mitchell* factors, even if J.P. and A.T. dealt with the same supervisor as Plaintiff, they were not subject to the same standards and were in a position of differentiating circumstances that distinguish them from Plaintiff. Because J.P. and A.T. were not "employees" and were subject to different VAMC policies, they are not "comparables" similarly situated to Plaintiff in the relevant aspects.

In contrast, the other VAMC employee named by Mr. Maxwell, Caucasian Gary Simmons, was given the exact same treatment as Plaintiff. (Defs.' Mot. at 7.) Like Plaintiff, Mr. Simmons was in a non-TDP. (*Id.*) Both Plaintiff and Mr. Simmons were drug tested based on the investigation into Mr. Maxwell. (*Id.*) However, Mr. Simmons, unlike Plaintiff, tested negative and, thus, there are "differentiating or mitigating circumstances" that explain the VAMC's differing treatment of the two employees. (Defs.' Reply 4, ECF No. 35.)

Although Plaintiff meets the first three elements of his *prima facie* case for race discrimination, he cannot show that any similarly situated non-protected employee was treated more favorably. Accordingly, he did not meet his burden in the first prong of *McDonnell Douglas* and is unable to shift the burden to Defendants. Defendants are therefore entitled to judgment on Plaintiff's race discrimination claim.

### 2. Plaintiff has failed to make a *prima facie* case of disability discrimination under the Rehabilitation Act.

Plaintiff also alleges his termination was motivated by discrimination on the basis of his disability. This claim is governed by the Rehabilitation Act, which provides the remedy for

federal employees alleging disability discrimination. The Act provides that, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The *prima facie* case for disability discrimination, although similar to that of race discrimination, requires a slightly different showing by the plaintiff. Under the Rehabilitation Act, a plaintiff seeking to establish his or her claim without direct proof of discrimination must establish each of the following five elements:

> (1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open.

*Jones*, 488 F.3d at 404 (citing *Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004)). As in Title VII claims, "the final element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Id.* (citing *Talley*, 61 F.3d at 1246) (internal quotes omitted).

In the present case, Defendants do not dispute that Plaintiff was disabled and otherwise qualified for the position, that it knew or had reason to know of his disability, or that he suffered an adverse employment action. But, as with the Title VII claim, Defendants argue that Plaintiff cannot show his position remained open or that similarly situated non-protected employees were treated more favorably.

The Court again concludes that Plaintiff has failed to identify any similarly situated employees outside the protected class who were treated more favorably than him. The one similarly situated, non-disabled employee Plaintiff identifies, Mr. Simmons, was drug-tested just

10

as Plaintiff was, but was not terminated because his drug test was negative. Therefore, Plaintiff is unable to meet his burden in the first prong of *McDonnell Douglas* as to his disability discrimination claim such that Defendants are entitled to judgment.

> **3.      Because Plaintiff has not made out a *prima facie* case of employment discrimination, the VAMC's lack of reasonable suspicion in ordering Plaintiff's drug test is irrelevant to his discrimination claims.**

After a hearing and argument, the MSPB found that "based on the totality of the circumstances," the VAMC failed to establish reasonable suspicion to order Plaintiff to take the drug test that resulted in his termination. (MSPB Decision, ECF No. 31-13.) Accordingly, Plaintiff argues that the VAMC lacked a legitimate, non-discriminatory reason for his termination. However, because Plaintiff was unable to carry his burden in establishing a *prima facie* case, the Court need not address the legitimacy of the VAMC's nondiscriminatory reason for terminating him. *See Clayton*, 281 F.3d at 612 (ending the court's *McDonnell Douglas* analysis after it determined the plaintiff could not establish a *prima facie* case of discrimination). As a result, the VAMC's failure to establish reasonable suspicion to drug test Plaintiff does not alter the Court's conclusion that his claims of race and disability discrimination lack merit.

**B.      Equal Pay Act Claim**

The United States Court of Appeals for the Sixth Circuit has established a "three-step burden shifting scheme" to evaluate claims under the Equal Pay Act. *Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752 (6th Cir. 2016). First, the plaintiff must establish a *prima facie* case by showing "that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id.* (alterations, internal quotation marks, and citations omitted). "Whether two positions are substantially equal for EPA purposes is a question of fact for the jury." *Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir.

11

2006).  Second, once the plaintiff establishes a *prima facie* case, "the defendant must prove that

the wage differential is justified under one of the four affirmative defenses set forth under

§ 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which

measures earnings by quantity or quality of production; or (4) any other factor other than sex."

*Id.* at 752–53 (internal quotation marks and citations omitted).  Finally, if the defendant proves

an affirmative defense, the plaintiff "must come forward with evidence demonstrating the

existence of a triable issue of fact regarding pretext."  *Id.* at 753 (internal quotation marks and

citations omitted).

Defendants argue that Plaintiff cannot make out a *prima facie* case because his job did

not entail substantially equal responsibility, skill or effort to that of the two female Recreation

Assistants.  Further, even if Plaintiff could satisfy his *prima facie* burden, Defendants rely on the

General Schedule of federal government salaries as a "factor other than sex" that justifies the

differential in pay between Plaintiff and the two female comparators.  The Court agrees that

Plaintiff cannot make out a *prima facie* case, and therefore analysis of Defendants' affirmative

defense is unnecessary.

### 1. Standards for Determining whether Two Jobs are "Substantially Equal"

The Sixth Circuit has frequently considered whether two jobs are "substantially equal"

for purposes of the Equal Pay Act.  In cases finding substantial equality of work, the facts

generally reflect two individuals who perform identical duties or who are treated as

interchangeable by their employer.  *E.g., Vehar v. Cole Nat. Grp., Inc.*, 251 F. App'x 993, 999

(6th Cir. 2007) (finding substantial equality among three programmers who provided support to

various groups "with no distinction between duties or responsibilities"); *Beck-Wilson*, 441 F.3d

at 364 (finding substantially equal work between nurse practitioners and physician assistants who

"worked side-by-side" and "often covered for one another while on the job"); *Kovacevich v.*

*Kent State Univ.*, 224 F.3d 806, 827 (6th Cir. 2000) (finding substantial equality between two university professors who were hired within a year of one another with similar prior experience, undertook the same workload requirements, worked within the same department, and were evaluated under the same criteria); *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (finding substantial equality between the jobs of two employees, where one was required to perform all of the duties previously performed by the other); *Odomes v. Nucare, Inc.*, 653 F.2d 246, 249 (6th Cir. 1981) (finding substantial equality between female nurse's aides and male orderlies who both bathed patients, distributed food trays, fed patients, took temperatures, and changed clothes and bed linens).

In contrast, the Sixth Circuit has found the substantial equality standard unmet when plaintiffs offer no evidence beyond bare assertions that two jobs involve the same skill, effort, and responsibility.  *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874 (6th Cir. 2013) is illustrative.  In *Warf*, the female plaintiff argued she was paid less by the Department of Veterans Affairs for substantially equal work by a male coworker, DeLong.  Warf, whose job title was "Program Support Assistant," was paid at the GS-6 level on the same General Schedule at issue here.  DeLong, whose job title was "Education Program Specialist," was paid as a GS-11.  *Id.* at 876–77.  The Sixth Circuit explained that Warf had failed to make a *prima facie* case under the Equal Pay Act because, although DeLong took over the internship-related duties that Warf had been performing, the remainder of his duties (involving educating and training psychology professionals) were non-overlapping and required a greater degree of skill than Warf's position as an administrative assistant.  *Id.* at 881.  The Sixth Circuit also noted that "a person's salary on the GS pay scale is influenced by his or her experience and educational background," pointing out that "[t]here is a significant difference between DeLong, who held a master's degree in

business and had seven years of experience teaching, and Warf, who was working towards her bachelor's degree but at the time held only an associate's degree." *Id.*  In the face of this evidence offered by the VA, Warf did not "provide any evidence that she and DeLong performed substantially similar jobs, nor [did] she address DeLong's professional background." *Id.* Thus, the Sixth Circuit upheld the district court's grant of summary judgment in the VA's favor. *Id. See also Conti v. Universal Enter., Inc.*, 50 F. App'x 690, 697 (6th Cir. 2002) (upholding summary judgment in favor of employer when the plaintiff "made only a conclusory allegation" that her "job duties were substantially equal to those of comparable male employees that were paid significantly more," and did not "come forward with evidence to show the specific duties and responsibilities of the positions" held by the comparator employees, without which she could not prove that "those jobs and [the plaintiff's] job required 'equal skill, effort, and responsibility' and were 'performed under similar working conditions.'") (quoting 29 U.S.C. § 206(d)(1)).

### 2. Plaintiffs' job was not substantially equal to that of his female coworkers.

Here, Plaintiff worked as a Recreation Assistant and was paid at the GS-5 level of the General Schedule of federal government salaries.  The two female employees who Plaintiff alleges performed substantially equal work (Tammy Jenkins-Pettiford and Kristy Williams) also held the title of Recreation Assistant, but were paid at the GS-6 level.  (Decl. of Melissa Williams ("Williams Decl.") ¶ 11, ECF No. 31-1).  Defendants submit the Declaration of Melissa Williams (not to be confused with comparator Recreation Assistant Kristy Williams), who previously worked for the VAMC as a Recreation Therapist, and, as of October 2016, became the Recreation Supervisor, with responsibility for supervising Plaintiff, Tammy Jenkins-Pettiford, and Kristy Williams.  (Williams Decl. ¶ 8.)  Melissa Williams's Declaration describes the type of work performed by the VAMC's Recreation Therapy Section and its different employee categories: At the highest level is the Recreation Supervisor, who supervises all the

employees in the Recreation Therapy Section and manages the gym, pool, and Recreation Clinic

on the Chillicothe VA premises, as well as providing recreational therapy directly to veterans.

(Williams Decl. ¶ 8.)  At the next level are Recreation Therapists, who assess patients when

admitted to the medical facilities at the Chillicothe VA, complete a "minimum data set"

assessing the veterans and capturing the therapy to be provided, and write up care plans with

recreational therapy goals.  Recreation Therapists attend treatment teams made up of nursing,

social work, dietary, and other professionals who meet during the patient's admission and at

regularly scheduled intervals after admission to discuss veteran progress and care needs.

Recreation Therapists occupy a range of positions graded GS-7 to GS-10.  (*Id.* ¶ 9.)  The final

category of employees in the Recreational Therapy Section are Recreation Assistants, whose

positions are graded GS-4 to GS-6 with increasing levels of difficulty and responsibility.  (*Id.*

¶ 9.)

Plaintiff's GS-5 Recreation Assistant position comprised engaging veterans in various

recreational activities.  (Wilson Aff. ¶ 17, ECF No. 34-1.)  Each day, his supervisor assigned him

a unit of veterans to engage in activities such as board games, card games, Wii sports, watching

movies, listening to music, and engaging in unstructured conversation or reminiscing.  (*Id.*

¶¶ 17–19.)  If veterans declined to participate in a scheduled recreational activity, Plaintiff went

to their rooms to engage them in conversation by asking questions such as "how are you feeling,

what branch of the service were you in, or what did you do in the military."  (*Id.* ¶ 18.)  Plaintiff

also led weekly bingo games and oversaw the gym and bowling alley at certain times of the

week.  (*Id.* ¶ 19.)  Plaintiff prepared notes summarizing his interactions with each veteran,

describing "what activity(ies) [Plaintiff] did with the veteran, the veteran's mood during the

activity, and whether the veteran participated willingly or reluctantly."  (*Id.* ¶ 20.)

15

The GS-6 Recreation Assistants had some overlap in job duties with the GS-5 position because Plaintiff, Jenkins-Pettiford, and Kristy Williams generally spent about 20 to 30 percent of their time performing similar duties at the gym and Recreation Clinic.  (Williams Decl. ¶ 11.) "But the GS-5 Recreation Assistant did not typically work side-by-side with the GS-6 Recreation Assistants."  (*Id.*)  Instead, for the remaining 70 to 80 percent of their time, the GS-6 Recreation Assistants engaged in higher-level recreational therapies and worked with the Recreation Therapists to adjust each veteran's care plan.  Both Jenkins-Pettiford and Kristy Williams had several years of prior experience as nurse assistants, and the Recreation Supervisor relied on them to independently make activity modifications to accommodate individual veterans' needs (*e.g.*, by accounting for cognitive deficits or left-side weakness).  (*Id.* ¶ 14.)  GS-6s would also use their independent judgment to decide whether it was appropriate to take patients off the controlled environment of the Community Living Center units to other areas of the Chillicothe VA.  (*Id.*)  They also used their knowledge and judgment to assess how well veterans navigated recreational activities outside the Community Living Center units to help determine whether a veteran was ready for discharge and reentry into the community.  (*Id.*)

The GS-6 Recreation Assistants also led more advanced, structured group therapy sessions using specific therapeutic techniques.  For example, reminisce groups conducted by the GS-6 Recreation Assistants entailed stimulating cognition with conversation balls that have different questions depending on where the veteran touches the ball, or conversation cards with pictures and words to stimulate cognition for veterans who have trouble speaking or who have mental impairments such as dementia.  (*Id.* ¶ 15.)  The GS-6s further provided the Recreation Therapists with detailed feedback about the veterans' mental and physical capabilities and

limitations, such as slower cognition in following through on instructions or decreases in range of motion.  (*Id.* ¶ 15.)

Finally, the GS-6 Recreation Assistants were also responsible for planning twice-monthly bingo outings at a nearby veterans' community center and planning a frequent cookie-baking activity.  (*Id.* ¶¶ 12–13.)  Both activities involved long-term planning and served large groups of veterans.  (*Id.*)

The Court finds the facts of this case similar to those in *Warf*.  Although Plaintiff and the GS-6 Recreation Assistants had some degree of overlapping duties, the majority of their time was spent on substantially different tasks.  Plaintiff's engaging veterans in informal games and conversation is not substantially equal to the structured therapies provided by the GS-6s, who used their prior experience as nursing assistants to monitor veterans' cognitive and physical limitations and work with the Recreation Therapists to modify the veterans' care plans accordingly.  Notably, Plaintiff disputes only a small portion of the GS-6 job duties as laid out by Defendants[1] and makes only a conclusory allegation that "I performed the same general duties as Tammy and Christy."  (Wilson Aff. ¶ 22.)  Even when viewing the disputed facts in favor of Plaintiff, he has not "provide[d] any evidence that [he] and [the GS-6 Recreation Assistants] performed substantially similar jobs, nor [did he] address [the GS-6s'] background."  *See Warf*, 713 F.3d at 881.  Because Plaintiff's work is not substantially equal in skill, responsibility, and

---

[1] The parties spend much of their briefs arguing over the skill required for the GS-6s' bingo outing and cookie baking activities, and Plaintiff also contests Defendants' assertion that GS-6s were responsible for evaluating veterans' dietary needs as part of the bingo outings.  However, even if planning and executing bingo outings and cookie baking is substantially equal to Plaintiff's job duties, the GS-6s' use of their backgrounds as nursing assistants to make independent judgments and recommendations as to the veterans' appropriate therapies would still mean that the GS-5 and GS-6 positions are not substantially equal.

17

effort to that of his female coworkers, Plaintiff has not established a *prima facie* case under the Equal Pay Act.[2]

## IV.    DISPOSITION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 31) is **GRANTED**.

The Clerk shall enter judgment in favor of Defendants as to all claims by Plaintiff Carl Wilson and close this case.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

---

[2] Plaintiff avers that, prior to deterioration of his health conditions in 2010, he "performed the exact same duties" as Jenkins-Pettiford and Kristy Williams.  (Wilson Aff. ¶ 22.)  He further states he asked his "then supervisor" Krin Woodbridge about the pay disparity between him and Jenkins-Pettiford and Kristy Williams, and Ms. Woodbridge "agreed that I should be paid as a GS-6 and she would do what she could to get my pay grade increased."  (*Id.*)  It is not clear when his conversations with Ms. Woodbridge took place, but the wording of his affidavit suggests they occurred prior to 2010.  As the Equal Pay Act carries a two-year statute of limitations, duties and discussions in 2010 are of little relevance to the present case.  *See Korte v. Diemer,* 983 F.2d 1067 (6th Cir. 1992) (applying FLSA's two-year statute of limitations in 29 U.S.C. § 255(a) to claims under the EPA).